## UNITED STATES *v.* THOMAS.

## THOMAS *v.* UNITED STATES.

### APPEALS FROM THE COURT OF CLAIMS.

Nos. 94, 95. Argued October 11, 1904.—Decided December 5, 1904.

While the intention of Congress in the Navy Personnel Act of March 3, 1899, was to put officers of corresponding rank in the Army and Navy on the same general footing with respect to their general pay and to make the act prospective in its application to any future legislation by which the general pay of army officers might be increased, Congress may increase the pay of army officers for services in particular places and under special circumstances without thereby intending such increase to apply to naval officers.

A captain in the Navy is not entitled to the ten per cent additional pay given to army officers under the acts of May 26, 1900, and March 2, 1901, for services in Philippine and Chinese waters or for service beyond the limits of the States comprising the Union.

The term "vessel employed by authority of law" within the meaning of § 1571, Rev. Stat., is restricted to vessels owned or chartered by, or otherwise engaged in the service of, the Government and while an officer is traveling on land or on a vessel other than one so employed by authority of law he is not entitled to pay for sea duty.

THIS was a petition for certain allowances claimed to be due petitioner as a captain in the United States Navy, under act of March 3, 1899, 30 Stat. 1004, equalizing the pay of army and navy officers, and known as the Navy Personnel Act. The findings of fact are too long to be here reproduced, but the several items claimed by petitioner, and from the disposition of which these appeals are taken, are cited by counsel in their brief and by the Court of Claims as follows:

1. From May 26, 1900, to March 1, 1901, he was paid sea pay of a captain, at $4500 a year, and claims ten per cent increase of this pay for service in the Philippines and in China, under the acts of May 26, 1900, and March 2, 1901. 31 Stat. 205, 895.

2. From March 2, 1901, to June 11, 1901, he was paid the sea pay of a captain, $4500 a year, and claims ten per cent

increase of this pay for service outside the United States, under the provisions of the act of March, 2, 1901, 31 Stat. 895, 903.

3. From June 12, 1901, to September 30, 1901, he was paid sea pay at $4500 a year, and claims ten per cent increase under the act of March 2, 1901, for service outside the United States. During this time he was in the waters of the San Francisco Bay, traveling from San Francisco to Puget Sound, and in the waters of Puget Sound. This claim is made provisionally in case his service in Chinese and Philippine waters is not considered to be service "in China" and "in the Philippine Islands," entitling him to ten per cent increase from May 26, 1900, to March 1, 1901. In that event he would claim that his service in waters of the United States was beyond the limits of the States comprising the Union.

4. Between December 2, 1899, when relieved as commanding officer of the U. S. S. Lancaster, and ordered to report to the Navy Department, and February 7, 1900, when he took command of the U. S. S. Baltimore at Hong Kong, China, he was paid only shore pay, $3825 a year, fifteen per cent less than sea pay. He claims sea pay, $4500 a year during that time.

The last item was disallowed. The first three items were at first disallowed, but on a rehearing were allowed and final judgment rendered for $568.29. 38 C. Cl. 113, 719. Both parties appealed to this court.

*Mr. Assistant Attorney General Pradt*, with whom *Mr. John Q. Thompson*, Special Assistant Attorney, was on the brief, for the United States.

*Mr. George A. King* and *Mr. William B. King* for Charles M. Thomas.

MR. JUSTICE BROWN, after making the foregoing statement, delivered the opinion of the court.

This case depends upon the construction given to section 13

of the Navy Personnel Act, declaring that "after June 30, 1899, commissioned officers of the line of the navy and of the medical and pay corps shall receive the same pay and allowances, except forage, as are or may be provided by or in pursuance of law for officers of corresponding rank in the army." The object of this act can best be understood by considering the prior legislation of Congress upon the same general subject, and the circumstances under which the act was passed. By the act of July 16, 1862, Rev. Stat. § 1466, the relative rank of army and navy officers was fixed by declaring that rear admirals shall rank with major generals, commodores with brigadier generals, captains with colonels, commanders with lieutenant colonels, lieutenant commanders with majors, lieutenants with captains, etc.

It was, however, a source of dissatisfaction to navy officers that some of them did not receive the same pay as corresponding officers of the army, although others received a larger pay. Thus by sections 1261 and 1556 the highest pay of a rear admiral, when at sea, was $6000, while a major general received $7500, a commodore received $5000 when at sea, while a brigadier general received $5500. A captain, however, when at sea received $4500, while a colonel received but $3500.

To remove this dissatisfaction Congress passed the Naval Personnel Act, assimilating the pay of navy officers to army officers of corresponding rank, with a proviso, however, "that no provision of this act shall operate to reduce the present pay of any commissioned officer now in the navy; and in any case in which the pay of such an officer would otherwise be reduced he shall continue to receive pay according to existing law."

The effect of this legislation was to raise the pay of certain navy officers to that received by army officers of corresponding rank, and to leave undisturbed the present pay of certain other navy officers, who were already receiving higher pay than army officers of the same rank.

The intention of Congress was evidently to put officers of

the army and navy on the same footing with respect to their general pay, and to make the act prospective in its application to future legislation, so that if Congress should thereafter raise the general pay of army officers as fixed by Revised Statutes, section 1261, a like increase should apply to navy officers. It does not, however, follow that Congress may not increase the pay of army officers for services in particular places or under special circumstances, without thereby intending that the same increase shall apply to naval officers performing the same service under like circumstances. Thus, if the act should allow army officers increased pay when ordered to sea or to a foreign port, it would not follow that naval officers would be entitled to a like increase, since such service would be wholly exceptional in the case of army officers, while it is the natural and normal duty of navy officers to engage in sea service, cruise in foreign waters and lie up in foreign ports. It never could have been the intention of Congress to disable itself from awarding to a particular class of army officers an increase of pay for exceptional services without thereby increasing the pay of navy officers, whose lives are largely passed in performing like services.

Confirmation of this view is found in the second proviso of section 13, "that when naval officers are *detailed for shore duty beyond seas* they shall receive the same pay and allowances as are or may be provided by or in pursuance of law for officers of the army detailed for duty in similar places." Here is a distinct recognition of the fact that when naval officers are detailed for a special or unusual duty beyond seas, they shall receive the same pay as army officers detailed for the same duties. This provision, however, would be wholly unnecessary if the act were given the broad application contended for, since the increased pay allowed to army officers for duty beyond seas would apply to naval officers, without a special proviso to that effect. Shore duty beyond seas being an exceptional duty, both to officers of the army and navy, and being probably attended by increased expenditures, and dangers incident to

a tropical climate, it is very natural that Congress should award them both increased compensation.

The principal questions in this case, however, arise from the army appropriation bills of May 26, 1900, and March 2, 1901, making appropriation for the support of the army for the year ending June 30, 1901, and 1902, the first of which contains the following proviso:

"*Provided*, That hereafter the pay proper of all officers and enlisted men serving in Porto Rico, Cuba, the Philippine Islands, Hawaii, and in the Territory of Alaska, shall be increased ten per centum for officers and twenty per centum for enlisted men, over and above the rates of pay proper as fixed by law in time of peace." 31 Stat. 211.

Here is an increase of ten per cent allowed to army officers serving in certain designated places. Doubtless if naval officers were detailed for shore duty in any of these islands they would receive a like increase of pay, under the proviso of section 13 of the Personnel Act heretofore quoted. But, unless they are detailed for shore duty, it is impossible to hold that they are entitled to extra pay, without treating as obsolete the above proviso requiring such detail.

The act of March 2, 1901, 31 Stat. 895, 903, making appropriation for the support of the army for the fiscal year ending June 30, 1903, contains the following proviso:

"*Provided*, That hereafter the pay proper of all officers and enlisted men serving beyond the limits of the States, comprising the Union and the Territories of the United States contiguous thereto, shall be increased ten per centum for officers and twenty per centum for enlisted men, over and above the rates of pay proper as fixed by law for time of peace, and *the time of such service shall be counted from the date of departure from said States to the date of return thereto:*

"*Provided further*, That the officers and enlisted men who have served in China at any time since the twenty-sixth day of May, 1900, shall be allowed and paid for such service the same increase of pay proper as is herein provided for."

Under this proviso an army officer ordered to the Philippine Islands receives an increase of pay from the day he leaves San Francisco until he returns there. This allowance was undoubtedly based upon the consideration that service both in the Philippines themselves and upon the voyage going and returning was an exceptional service, attended by peculiar hardships; but to say that navy officers shall be entitled to the same increase is practically to add ten per cent to their sea pay from the moment they leave a port of the United States until they return thereto; in other words, to increase their normal sea pay ten per cent whenever they are serving beyond the limits of the States.

So far as applied to naval officers, it goes further than this. The act of 1901 does not, as did the act of 1900, limit the increase of pay to officers serving in our island possessions and in Alaska, but extends it to all serving "beyond the limits of the United States," so that if applied to naval officers, whenever a vessel is ordered to sea beyond the three-mile limit, be it only upon a practice cruise or a voyage from Pensacola to New York, every officer on such vessel is entitled to a ten per cent increase of his ordinary pay from the day he sets sail until the day he returns.

It is not for a moment to be supposed that Congress contemplated any such sweeping innovation. This construction would not only render nugatory and obsolete the proviso of the Personnel Act that officers to be entitled to army pay shall be detailed for shore duty, but largely discriminates in favor of naval officers by adding ten per cent to their pay for their normal sea duties without a corresponding addition to the pay of army officers for the performance of *their* normal duties which are upon land; in other words, instead of assimilating it actually dissimilates the pay of army and naval officers.

In our opinion the proviso that naval officers shall be entitled to army pay "when detailed for shore duty beyond seas," is not repealed or rendered inoperative by anything contained

in the acts of May 26, 1900, and March 2, 1901, and that naval officers are not entitled to an increase of pay while discharging their ordinary sea duties.

It is significant in this connection to notice that in the appropriation act of March 2, 1901, for the support of the army for the fiscal year of 1902, there was an item of $500,000 for an "additional ten per centum increase on the pay of officers serving at foreign stations." 31 Stat. 903. This was followed by a similar provision in the appropriation act of June 30, 1902, for the year of 1903, the amount appropriated being $451,456, 32 Stat. 507, 512, and in the army appropriation act of March 2, 1903, for the year 1904, there was also an item of $200,000 for the same purpose. 32 Stat. 933. So also in the appropriation act of April 23, 1904, 33 Stat. 259, 266, for the year 1905, there is an item for an additional ten per centum increase on the pay of commissioned officers serving in the Philippine Islands, the island of Guam, Alaska, China and Panama of $167,426.30.

Notwithstanding these repeated provisions for the increase of army pay, Congress has never made an appropriation for the largely increased pay to which naval officers would be entitled under the acts of 1900 and 1901, or otherwise recognized their claim for increased pay to which such officers would be entitled upon the theory of the petitioner in this case. This omission lends support to the theory that Congress supposed that the ordinary sea services of naval officers were sufficiently compensated by the addition of fifteen per centum to their shore pay.

2. Different considerations apply to the claim of petitioner to sea pay from December 2, 1899, to February 7, 1900. Claimant was relieved as commanding officer of the Lancaster, then at Barbadoes, December 2, 1899, and ordered to report to the Navy Department, where he arrived, by merchant steamer, December 12, 1899. Upon the following day he was ordered to proceed to Hong Kong for duty on the Asiatic station, and sailed by merchant steamer from San Francisco,

January 6, 1900. He reported in obedience to his orders, and was assigned to the command of the Baltimore at Hong Kong, February 7, 1900. Between December 2, 1899, and February 7, 1900, petitioner was occupied in traveling on duty, partly on merchant steamer and partly on land, and in reporting to the Navy Department. During this time his pay was reduced fifteen per cent from the regular sea pay, in accordance with the first proviso of the Personnel Act, which declares that "such officers when on shore shall receive the allowances, but fifteen per centum less pay than when on sea duty."

The order detaching him from the Lancaster was as follows:

"SIR: You are hereby detached from duty in command of the U. S. T. S. Lancaster, will proceed immediately to Washington, D. C., and report at the Navy Department, at that place, for special temporary duty.

"Hold yourself in readiness for orders to sea duty.

"This employment on shore duty is required by the public interest.

"Respectfully,

"(Sgd.) A. S. CROWNINSHIELD,

"*Acting Secretary.*

"Captain CHARLES M. THOMAS, U. S. N.,

"U. S. T. S. Lancaster."

The next day, after reporting to the Navy Department under this order, he was ordered to proceed to San Francisco, California, and thence to Hong Kong. It thus appears that while he was not regularly detailed for shore duty, he was ordered to report at the Navy Department for a special temporary duty, and the final sentence of the latter indicates that it was regarded as an employment on shore duty. He was allowed by the Department fifty dollars traveling expenses from Barbadoes to New York, but was not allowed either mileage or sea pay. The Court of Claims, however, allowed him mileage under section 13 of the Navy Personnel Act, and

a clause of the Army Appropriation Act of March 3, 1899, 30 Stat. 1064, 1068, providing "that hereafter the maximum sum to be allowed and paid any officer of the army shall be seven cents per mile, distances to be computed over the shortest usually travelled routes;" but mileage seems not to have been claimed for his traveling from Washington to Hong Kong, by reason of the further provision of the same act "that actual expenses only shall be paid to officers when travelling to and from our island possessions in the Atlantic and Pacific Oceans." The Government apparently acquiesced in this allowance of mileage, as it made no appeal therefrom.

But the Court of Claims further held that, under Rev. Stat. section 1571, he was not entitled to sea pay, because, by that section "no service shall be regarded as sea service except such as shall be performed at sea, under the orders of a department and in vessels employed by authority of law."

This construction must necessarily be correct, unless we are prepared to hold that a steamer upon which a naval officer takes passage under the orders of the department is a "vessel employed by authority of law." Obviously, it does not admit of this construction. A person who takes passage upon a steamer or a seat in a railway carriage does not "employ" such steamer or carriage in any just sense. We think the term "vessels employed by authority of law" is restricted to vessels owned or chartered by the Government, or otherwise engaged in the service of the United States.

Sea duty being duty at sea upon such vessels, an allowance for mileage is obviously inconsistent with such duty, as the pay of the officer necessarily includes travel upon such vessels; while it is appropriate to shore duty, since travel upon such duty is performed either upon land or upon vessels not engaged in Government service.

There is nothing in the Navy Personnel Act inconsistent with or repealing Rev. Stat. section 1571, and the case of Gibson v. United States, 194 U. S. 182, is not in point. In that case it was held that the Personnel Act did repeal sections 1578

and 1585, allowing sea rations, because the later act covered the same subject and superseded the provisions of those sections. There is no such conflict between section 1571 and the Personnel Act.

The ruling of the Court of Claims in this last particular was correct; but for the error in the previous ruling the decree must be

*Reversed.*